T.C. Memo. 2009-91

UNITED STATES TAX COURT

OTIS E. AND JUDY ROBERTSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1616-06, 24391-06.    Filed April 29, 2009.

Otis E. and Judy Robertson, pro sese.

<u>Mark H. Howard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' income taxes, section 6651(a)(1)[1] additions to tax,

_____

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  Amounts are rounded to
the nearest dollar.

and section 6662 accuracy-related penalties for 2001 and 2002 as
follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|---------------------------------|----------------------|
| 2001 | $3,779 | $356 | $755 |
| 2002 | 57,753 | 14,438 | 11,551 |

After concessions, the issues for decision are:[2]

(1)  Whether petitioners had unreported long-term capital
gain of $44,549 in 2001 as a result of a distribution from
Quality Engine & Supply, L.L.C. (QES).  We hold they must
recognize long-term capital gain of $44,549;

(2)  whether petitioners had unreported long-term capital
gain of $328,901 for 2002 as a result of a distribution by QES.
We hold they must recognize long-term capital gain of $200,000;

_____

[2]In the notice of deficiency for 2001 respondent determined
that petitioners failed to report $499 in interest income and
$517 in royalty income.  Petitioners did not assign error to
these adjustments in their petition for 2001 and did not contest
these adjustments on brief or at trial.  See Rule 34(b)(4).  We
hold that petitioners have conceded these adjustments.
Respondent also determined that petitioners received $5,982 in
taxable Social Security benefits.  Petitioners note that the
taxation of the Social Security benefits is a computational item
and do not otherwise contest this issue.

(3) whether petitioners are entitled to an ordinary loss deduction of $63,512 for 2002 as petitioner husband's distributive share of loss from QES. We hold petitioners are not entitled to an ordinary loss deduction;

(4) whether petitioners are liable for additions to tax for late filing under section 6651(a)(1) for 2001 and 2002. We hold they are liable; and

(5) whether petitioners are liable for section 6662 accuracy-related penalties for 2001 and 2002. We hold they are not liable with respect to QES items and are liable with respect to conceded income amounts for 2001.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of facts and the accompanying exhibits are incorporated by this reference. Petitioners resided in South Carolina at the time they filed the petitions in these consolidated cases.

During 2001 and 2002 petitioners were the sole members of QES, a limited liability company treated as a partnership for Federal income tax purposes. QES was engaged in the business of car engine repair and restoration. Petitioner husband started QES with Terry Campbell (Mr. Campbell) in October 1990 with each owning 50 percent of the company. In October 1997 petitioners purchased Mr. Campbell's interest for $75,000. Their agreement included a covenant not to compete provision, with $50,000

payable at the time of the sale and $25,000 payable within 2 years. Petitioners obtained a loan of $65,000 using their residence as collateral to finance the purchase of Mr. Campbell's interest in QES. Petitioners used the remaining loan proceeds to purchase inventory for QES. For 2001 QES reported that petitioner husband owned a 51-percent profits and loss interest and a 51-percent capital interest and petitioner wife owned a 49-percent profits and loss interest and a 49-percent capital interest. For 2002 QES reported that petitioner husband and petitioner wife each owned a 50-percent profits and loss interest and a 50-percent capital interest.

In February 1999 QES acquired two adjoining parcels of land at 1312 Flint Street and 1304 Flint Street, Rock Hill, South Carolina, for $50,000. QES also paid $10,000 to a third party who had an option to purchase the 1312 Flint Street parcel for release and cancellation of the option. QES obtained a $175,000 line of credit from National Bank of York County (National Bank) to finance the purchase of the Flint Street properties and construction costs for buildings on the properties (construction loan). The construction loan was secured with mortgages on the Flint Street properties and petitioners' personal residence. Petitioners also personally guaranteed the construction loan. When the construction loan matured on July 5, 1999, the parties modified the terms of the loan to increase the line of credit to

$250,000 and extend the maturity date to May 5, 2000. QES used the construction loan to refurbish a building at 1312 Flint Street that was damaged by fire and to construct a building at 1304 Flint Street. QES also moved a metal building that it had purchased for $10,000 to the Flint Street location. On April 28, 2000, QES obtained a loan of $301,500 from Bank of America (the Bank of America loan) that QES used to repay the construction loan of $251,934. The Bank of America loan was secured by the 1304 and 1312 Flint Street properties, and petitioner husband provided a personal guaranty. The terms of the loan provided an additional $301,500 line of credit for a maximum loan of $603,000.

On July 12, 2001, QES sold the 1312 Flint Street property for $200,000. The settlement statement reported net proceeds to QES of $44,549 after payment of the Bank of America loan and other expenses. On July 23, 2001, petitioners deposited the proceeds into a newly opened interest-bearing account in their individual names with National Bank, which later became South Carolina Bank & Trust of the Piedmont (SCBT). QES filed a Form 1065, U.S. Return of Partnership Income, for 2001 that reported a net loss of $32,000 from the sale of the 1312 Flint Street property, computed as follows:

| | |
|---|---|
| Sale price | $200,000 |
| Less:  Cost and other basis | 310,000 |
| Plus:  Depreciation previously claimed | 78,000 |
| Net loss | 32,000 |

Petitioners did not claim the $32,000 loss on their 2001 individual return.  In the notice of deficiency for 2001 respondent determined that petitioners realized long-term capital gain of $44,549 from the sale of property owned by QES and that the net proceeds were distributed to petitioners during 2001.

On June 28, 2002, QES sold the 1304 Flint Street property for $275,000 and its business inventory and other assets for $200,000 to Adkin Enterprises, L.L.C.  The settlement statement for the 1304 Flint Street property reported net proceeds to QES of $128,901 after payment of the Bank of America loan and other expenses.  The settlement statement for the sale of inventory and other business assets reported net proceeds of $200,000.  QES received a check for $328,901 from the transactions.  On July 2, 2002, petitioners deposited $200,000 into a newly opened interest-bearing account in the name of Quality Engine & Supply Trust (QES trust account) with SCBT.  The remaining $128,901 in proceeds was paid to Quality Engine, L.L.C., in the form of a cashier's check issued by SCBT on July 1, 2002.

QES reported the 2002 sales on Form 4797, Sales of Business

Property, as an asset sale occurring on June 30, 2002, for $475,000.  The return reported a loss on the sale of $5,691 computed as follows:

| | |
|---|---:|
| Sale price | $475,000 |
| Less:  Cost and other basis | 514,000 |
| Plus:  Depreciation previously claimed | 33,309 |
| Net loss | 5,691 |

QES's 2002 return reported an ordinary loss of $127,025 resulting primarily from operating expense deductions. Petitioners claimed an ordinary loss on their 2002 individual return of $63,512, attributable to petitioner husband's distributive share of the QES loss.  Petitioners did not claim a loss deduction for petitioner wife's distributive share. Petitioners did not separately report the $5,691 loss from the asset sale on their individual return.  In the notice of deficiency for 2002 respondent disallowed the $63,512 ordinary loss and determined that petitioners realized long-term capital gain of $328,901 from the distribution of the 2002 proceeds or, in the alternative, from the sales of their interests in QES.

Petitioners' 2001 return was due under extension on October 15, 2002, and they filed it on December 6, 2002.  Petitioners' 2002 return was due under extension on August 15, 2003, and they filed it on December 24, 2003.  Petitioners' 2001 and 2002 individual returns were prepared by Gregory T. Mayer, a tax return preparer doing business as Legal Tax Newsletter, L.C.  Mr.

Mayer also prepared QES's 2001 and 2002 partnership returns. Petitioners provided their personal and business tax records to Mr. Mayer with sufficient time for him to prepare the returns by their April 15 due date.  Mr. Mayer informed petitioners that he would not be able to prepare their returns on time and that extensions were necessary.  Mr. Mayer passed away some time after preparing petitioners' 2003 return, which he dated May 13, 2005. Many of QES's and petitioners' tax documents were in Mr. Mayer's office and were destroyed by his landlord following his death.

During the time petitioners engaged Mr. Mayer to prepare their returns, he was under investigation by the U.S. Department of Justice in connection with his tax return preparation activities.[3]  See United States v. Mayer, 91 AFTR 2d 2003-1730 (M.D. Fla. 2003) (granting a temporary restraining order against Mr. Mayer and requiring him to provide a customer list).  In March 2005 the U.S. District Court for the Middle District of Florida entered an order enjoining Mr. Mayer from preparing any tax forms that he knew would result in understatements of tax, preparing false or fraudulent returns, and selling fraudulent tax schemes, specifically identifying returns that asserted a section 861 argument (which relates to U.S. source income).  United States v. Mayer, 95 AFTR 2d 2005-2033 (M.D. Fla. 2005).

---

[3]The Court takes judicial notice of the District Court case against Mr. Mayer.

Petitioners replaced him as their tax return preparer for the 2004 tax year.

OPINION

Section 731(a) sets forth rules governing a partner's gain recognition on distributions from the partnership. A partner must recognize gain upon a distribution from the partnership to the extent that the money (including marketable securities) distributed exceeds the adjusted basis in the partner's interest in the partnership immediately before the distribution. Sec. 731(a). Any gain recognized under section 731(a) is considered gain from the sale or exchange of the partnership interest of the distributee partner. Sec. 731(a). In the case of a sale or exchange of a partnership interest, gain recognized to the transferor partner is generally treated as gain from the sale or exchange of a capital asset. Sec. 741. To resolve the dispute as framed by the parties, petitioners' tax liabilities arising from their ownership of QES requires a two-step analysis: (1) Whether petitioners received distributions from QES during 2001 and 2002; and (2) if they did, whether they had sufficient bases in their QES interests for the distributions to be tax free.

A.  2001 Sale

Respondent argues that petitioners received a distribution from QES of the $44,549 net proceeds from the sale of the 1312 Flint Street property during 2001. Respondent further argues

that the distribution is taxable long-term capital gain to petitioners because they failed to substantiate their bases in their QES interests. Respondent contends that petitioners' adjusted bases in their QES interests immediately before the distributions were zero, citing the zero balances reported for petitioners' capital accounts on QES's 2001 return. Petitioners argue that the proceeds were not distributed to them; rather, they were used to pay QES's liabilities. Petitioners further argue that the alleged payments of QES's liabilities created bases in their QES interests. Petitioners contend that they had a total basis in their QES interests as of December 31, 2001, of $510,635 computed as follows:

| | |
|---|---|
| Loans from officers | $54,000 |
| Partner's capital | 333,663 |
| Payment of QES liabilities | 37,972 |
| Purchase of Campbell interest and noncompete covenant | 75,000 |
| Purchase of option | 10,000 |
| Total adjusted basis | 510,635 |

Petitioners deposited the proceeds in a newly established bank account opened in their individual names. Petitioners contend that $37,972 was withdrawn during 2001 to pay QES's debt. Although we generally find petitioner husband's testimony to be honest, petitioners have not produced sufficient documentation to support his testimony. Petitioners produced bank statements from August 15, 2001, to December 15, 2002, showing 14 withdrawals totaling $49,697. The bank statements do not contain any

information regarding the recipients of the withdrawals or the purposes of the purported expenditures. Petitioners attached a schedule to their posttrial brief listing some of the recipients and the purposes of the expenditures. However, this evidence is not properly before the Court. See Rule 143(b). Petitioners produced bank statements for 2003, 2004, and 2005 that also lack sufficient information to determine the uses or recipients of the funds. We find that petitioners received a distribution from QES of $44,549 from the 2001 proceeds.

Petitioners must recognize income on the distributed proceeds to the extent that it exceeds their adjusted bases in their QES interests in 2001. Sec. 731(a). Petitioners have not established that they had sufficient bases in their QES interests for the distributions to be tax free. Petitioners presented a balance sheet for the year ending December 31, 2001, in support of their computation of their bases in QES. Petitioners did not present any evidence to document the entries on the balance sheet or any testimony concerning the balance sheet. The purpose for which the balance sheet was prepared is unclear, and the balance sheet conflicts with QES's 2001 return. The 2001 return reported total yearend liabilities of $416,903, but the balance sheet reported total liabilities of $233,938. Also, the 2001 return reported no partner capital, but the 2001 balance sheet reported capital of $333,663, with retained earnings of $204,742 and

withdrawals of retained earnings of $128,921. The 2001 return and the balance sheet also report differing amounts of total QES assets. Petitioners did not provide any explanation for these discrepancies. In addition, the balance sheet shows officer loans, but there is no documentation for these loans.[4]

Apart from the balance sheet, petitioners presented some evidence of equipment contributed to QES, their capital account near the time QES was formed, and the purchase of Mr. Campbell's interest in 1997. The determination of a partner's adjusted basis in a partnership interest requires more information, including annual distributive shares of partnership income and losses and distributions made by the partnership since its inception. The record lacks information on petitioners' distributive shares of income or loss and any distributions made during the intervening years. Without this information we cannot determine whether petitioners' bases in QES exceeded the distribution. The fact that petitioners did not claim their reported $32,000 loss from the sale on their individual return also suggests that they lacked bases in their QES interests. Partners may deduct their distributive shares of loss only to the

---

[4]Petitioners presented copies of five checks totaling $13,800 from 2000 to 2002 from a personal bank account, made out to QES with notations of loan to QES. The record lacks any other documentation of the alleged loans from officers of $54,000. We find that the net proceeds were not distributed to petitioners in repayment of any loans.

extent of their bases in their partnership interests. Sec. 704(d). Accordingly, the entire $44,549 distribution is taxable long-term capital gain as respondent determined.

In the notice of deficiency for 2001 respondent determined that petitioners realized long-term capital gain from the sale of the 1312 Flint Street property by QES. Section 702 subjects a partner to tax on the partner's distributive share of partnership income when realized by the partnership regardless of whether that income is actually distributed to the partner. See Chama v. Commissioner, T.C. Memo. 2001-253; sec. 1.702-1(a), Income Tax Regs. Gain from the sale of property should be recognized and included in gross income. Sec. 61(a)(3). The amount of gain is the excess of the amount realized from the sale over the adjusted basis of the property. Sec. 1001(a). At trial respondent argued that evidence relating to the bases of the assets sold by QES was not relevant. In his posttrial brief respondent generally ignored the requirement that partners recognize gain on the sale of assets by the partnership and instead sought to tax the distribution of the proceeds. Accordingly, we find that

respondent has waived the argument that petitioners are subject to tax on QES's sale of the 1312 Flint Street property.[5]

The tax consequence to petitioners would be the same had respondent sought to tax the gain QES realized on the sale of the 1312 Flint Street property.  Respondent reduced the amounts realized on the sale by the amount of the Bank of America loan, and petitioners have not established that QES had a basis in the Flint Street properties in excess of the Bank of America loan that would reduce the amount of long-term capital gain respondent determined.  Petitioners presented voluminous records of the construction costs of both the 1304 and the 1312 Flint Street buildings.  However, the construction costs do not establish a basis in the Flint Street properties in excess of the Bank of America loan.

B.  2002 Sale

Respondent determined that petitioners had unreported long-term capital gain of $328,901 for 2002 as a result of a distribution from QES of the net proceeds from the 2002 transaction.  Petitioners contend that the proceeds were not distributed because they were used to pay QES's outstanding

---

[5]The tax effect to petitioners would be the same under either argument.  The $44,549 capital gain that petitioners would recognize on the sale of the 1312 Flint Street property would increase their bases in their QES interests.  As a result petitioners would not be taxed on the $44,549 distribution.  Sec. 705(a).

liabilities.  Petitioners further contend that their total basis in their QES interests at the end of 2002 was $646,551, which is based on the above computation of the 2001 basis plus the payment of QES's liabilities of $132,916.

Petitioner husband testified that the proceeds were used to pay QES's remaining liabilities after the disposition of QES's assets.  Petitioners produced bank statements from the QES trust account for 2002 that show withdrawals of $178,202 and copies of canceled checks that show the recipients of some of the withdrawals and notations of the purpose of the payment.  Petitioners also attached a schedule to their posttrial brief listing the recipients and purposes of the payments.[6] Petitioners contend that $132,916 of these withdrawals was used to pay QES's liabilities, and thus concede that $45,286 was distributed for personal or nonbusiness purposes, including a downpayment on a residence in Arizona purchased on November 1, 2002, as rental property.  Petitioners erroneously included $10,200 they transferred to Quality Vehicle Repair & Sales L.L.C. (QVR), another of their business ventures, as withdrawals to pay QES's liabilities.  It appears from the record that QVR was engaged in a line of business different from QES's and was not a

---

[6]As noted above, information contained in schedules attached to posttrial briefs that was not presented at trial is not properly before the Court.  See Rule 143(b).  The schedule lists the purposes of expenditures paid from the QES trust account and contains evidence that was not presented at trial.

continuation of QES's business operations.[7]  The transfers to QVR should be treated as distributed to petitioners.  We also question whether certain other payments from the QES trust account were used to pay QES's liabilities, including:  (1) Four withdrawals identified in the schedule as relating to the purchase and/or repair of trucks, totaling $53,094.  There is no evidence that the trucks were used in QES's business; (2) three payments identified as Visa travel, totaling $7,733.  There is no evidence concerning whether the Visa account was business or personal; (3) two withdrawals identified as relating to concrete, totaling $1,447.  The notation on one check indicates that petitioners used the concrete for a motor home.  There is no evidence concerning the motor home and whether it was used for business purposes; and (4) a withdrawal of $54,150 to SCBT for the payment of a loan.  There is no documentation relating to an unpaid business loan from SCBT to QES during 2002.  The above-listed payments and the transfers to QVR represent $126,624 of the $132,916 in alleged business-related withdrawals from the QES trust account during 2002.  We cannot determine from the record

---

[7]Petitioners reported a loss of $7,614 from QVR on Schedule C, Profit or Loss From Business, of their 2002 return.  The return used an employer identification number (EIN) for QVR that was different from the EIN used for QES.  However, subsequent-year partnership returns filed for QVR erroneously used QES's EIN.  Petitioner husband stated that this mistake had been corrected.  Petitioners' treatment of QVR does not affect our determination that the 2002 sale was a disposition of QES's assets.

whether these amounts were used to pay QES's liabilities.  We also note that the record contains evidence that petitioners used their business entities to pay personal expenses at various times.  Under these circumstances, we find that the $200,000 deposited into the QES trust account was not used to pay QES's liabilities and was distributed to petitioners during 2002 for their personal benefit.  As stated above, petitioners attempted to present evidence of their bases in QES.  Petitioners failed to establish that they had adjusted bases in their QES interests in 2002 so that the distribution is not subject to tax under section 731(a).  Accordingly, we hold that petitioners realized long-term capital gain of $200,000 for 2002.

Petitioners contend that QES used the $128,901 cashier's check to pay QES's liabilities.  On its 2002 return QES reported inventory and purchases of $425,000 and beginning-of-the-year liabilities in excess of $600,000.  We recognize that the record lacks specific information about the use of the cashier's check.  However, we find petitioner husband's testimony honest.  There is no evidence to contradict his testimony.  Although we find the amount deposited into the QES trust account was not used for QES's business purposes, it is unrealistic to assume that QES did not have any outstanding liabilities after the 2002 transaction

and payment of the Bank of America loan.  Accordingly, we find that the cashier's check was not distributed to petitioners.[8]

Petitioners characterize the 2002 transaction as a complete disposition or sale of QES.  Respondent asserts that petitioners would be taxable on the $328,901 proceeds for 2002 under this alternative characterization of the transaction as a sale of petitioners' QES interests.  Petitioners structured the transaction as an asset sale and reported the 2002 sale on QES's 2002 return as a sale of business assets rather than reporting the transactions on their 2002 individual return as a sale of their QES interests .  Petitioners have not provided any reason to disregard the form they chose. Accordingly, we hold that the 2002 transaction was not a disposition of their interests in QES.

C.   2002 Ordinary Loss Deduction

For 2002 QES reported an ordinary loss of $127,025.  On their 2002 individual return petitioners claimed a loss deduction of $63,512, attributable to petitioner husband's distributive

_____

[8]The 2002 sale included the sale of inventory, which might properly result in ordinary income.  See sec. 751(a).  The notice of deficiency determined petitioners realized long-term capital gain for 2002 on the basis of the distribution from QES. Respondent has not argued that any portion of the gain is taxable as ordinary income.  We determine that respondent has conceded this characterization issue.  Likewise, we treat respondent as conceding any argument concerning petitioners' gain recognition from the sale of QES's assets during 2002 for the reasons we stated for the 2001 sale.  Nor have petitioners proved that QES had a total basis in the assets sold in excess of the Bank of America loan.

share of QES's ordinary loss. A partner must take into account his distributive share of each item of partnership income, gain, loss, deduction, or credit. Sec. 702(a); Vecchio v. Commissioner, 103 T.C. 170, 185 (1994). A partner may deduct his or her distributive share of partnership loss only to the extent of the partner's adjusted basis in his or her partnership interest at the end of the partnership taxable year in which the loss occurred. Sec. 704(d); Sennett v. Commissioner, 80 T.C. 825 (1983), affd. 752 F.2d 428 (9th Cir. 1985). Respondent disallowed the $63,512 loss deduction because petitioner husband lacked sufficient basis in his QES interest to deduct his distributive share of QES's loss. However, petitioners failed to provide sufficient evidence for the Court to determine petitioner husband's adjusted basis in his interest in QES for 2002 because there is no evidence in the record of partnership income, loss, or distributions during the intervening years. We find that petitioners are not entitled to the $63,512 loss deduction for 2002.

D.   Section 6651 Additions To Tax

Section 6651(a)(1) imposes an addition to tax for failure to timely file a Federal income tax return by its due date with extensions. The addition is 5 percent of the tax required to be shown on the return for each month, or fraction thereof, that the return is late, not to exceed 25 percent. Id.   The addition to

tax does not apply if the failure is due to reasonable cause, and not to willful neglect.  Id.  Reasonable cause exists for a late filing if the taxpayer exercised ordinary business care and prudence but was nevertheless unable to file on time.  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Factors  that constitute "reasonable cause" include unavoidable postal delays, death or serious illness of the taxpayer or an immediate family member, or reliance on a competent tax professional in a question of law of whether it is necessary to file a return.  McMahan v. Commissioner, 114 F.3d 366, 369 (2d Cir. 1997), affg. T.C. Memo. 1995-547.  Reliance on a tax professional to file a return is ordinarily not reasonable cause for late filing.  United States v. Boyle, 469 U.S. 241, 252 (1985); Wyatt v. Commissioner, T.C. Memo. 2008-253.  Respondent bears the initial burden of production to introduce evidence that the return was filed late. Sec. 7491(c). Petitioners bear the burden of proving that the late filing was due to reasonable cause and not willful neglect. Sec. 7491(a); Higbee v. Commissioner, 116 T.C. 438, 447 (2001). The parties stipulated that the 2001 and 2002 returns were filed after their extended due dates.  Respondent has met his burden of production.

Petitioners contend that they had reasonable cause for their late filings because the late filings were caused by hurricanes in Florida, where their return preparer was during 2002 and 2003;

a tornado that hit the return preparer's office; and the extraordinary circumstances faced by the return preparer from the Federal investigation of his business activities.  Petitioners' suggestion that hurricanes caused the late filing is not supported by the record or other fact.  Petitioners cite disaster declarations issued by the Federal Emergency Management Administration (FEMA) relating to Tropical Storms Allison and Gabriel during 2001 for certain areas of Florida.[9]  Mr. Mayer's office was in Pinellas County, Florida.  The disaster declarations did not cover Pinellas County.  Likewise, FEMA issued a disaster declaration for Hurricane Isabelle, the alleged cause for the late filing for 2002, covering the State of North Carolina.  It did not cover any portion of South Carolina where petitioners resided at the time of filing their 2002 return.  Moreover, petitioners' 2002 return was due under extension on August 15, 2003, more than a month before the FEMA declaration on September 28, 2003.  Finally, petitioners did not provide any evidence, except for petitioner husband's statements, that a tornado struck Mr. Mayer's office during the years at issue.

Petitioners provided their tax records to Mr. Mayer before the April 15 due date for both years at issue, but Mr. Mayer informed petitioners that he would need additional time to

---

[9]The Court takes judicial notice of disaster declarations made by FEMA.

prepare the returns and that extensions were necessary. Unfortunately, at the time petitioners were not aware of the legal troubles that Mr. Mayer faced relating to his tax return preparation activities. There is no evidence or allegation that petitioners were connected in any way with Mr. Mayer's alleged illegal activities. Petitioners relied on Mr. Mayer in good faith to timely file their returns. However, such reliance cannot constitute reasonable cause for the late filings under the bright line rule set forth by the Supreme Court in United States v. Boyle, supra at 252. Accordingly, we hold that petitioners are liable for the section 6651(a) addition to tax for 2001 and 2002.

E.    Section 6662 Accuracy-Related Penalties

Section 6662(a) and (b)(1) and (2) imposes a 20-percent penalty on the portion of an underpayment of tax attributable to (1) negligence or disregard of rules and regulations, or (2) a substantial understatement of income tax. Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Sec. 6662(c); see Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. A substantial understatement of income tax is defined as an understatement that exceeds the greater of 10 percent of the

tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

The section 6662(a) penalty is not imposed with respect to any portion of an underpayment as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1); sec. 1.6662-3(b)(3), Income Tax Regs.  The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances, including the extent of the taxpayer's efforts to assess his or her proper tax liability, the taxpayer's education, knowledge, and experience, and the taxpayer's reasonable reliance on a tax professional.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Reasonable cause exists where a taxpayer relies in good faith on the advice of a qualified tax adviser and the taxpayer provided the adviser with all necessary and accurate information.  See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Petitioners substantially underreported their income for 2001 and 2002 as a result of income and loss items from QES. Petitioners argue that they are not liable for the section 6662 penalties because they reasonably relied on their return preparer, Mr. Mayer.  Petitioners are unsophisticated taxpayers and have limited experience with the complicated partnership tax concepts arising from their ownership of QES.  At the time

petitioners filed their 2001 and 2002 returns, they reasonably believed that Mr. Mayer was a qualified tax professional with sufficient education and experience to prepare QES's and their individual returns. They were not aware of the Federal investigation into Mr. Mayer's activities or the temporary restraining order against him. They first learned of the extent of Mr. Mayer's legal troubles around the time of trial. There is no evidence that petitioners were in any way connected to Mr. Mayer's illegal activities.

The deficiencies result from petitioners' failure to prove QES used the sale proceeds to pay liabilities and their failure to substantiate their bases in their QES interests. Petitioner husband credibly testified that he provided Mr. Mayer with all necessary and relevant information. However, many of their business records that were at Mr. Mayer's office were destroyed after his death. This death significantly hindered petitioners' ability to produce requested documentation during the audit of their returns and to prepare for trial. Nevertheless, petitioners made their best efforts to provide whatever records they had or could obtain from their banks. Petitioners presented voluminous records to document construction costs of the Flint Street buildings and QES's other liabilities in their attempt to substantiate their bases in their QES interests. Under these circumstances, we do not find that petitioners' failure to

provide additional records is negligent, as respondent argues. See Pratt v. Commissioner, T.C. Memo. 2002-279. Petitioners reasonably and in good faith relied on Mr. Mayer to accurately prepare their 2001 and 2002 returns. We find that petitioners are not liable for a section 6662 penalty for 2001 or 2002 arising from their ownership of QES.[10]

Petitioners conceded that they failed to report $499 in interest income and $517 in royalty income for 2001. Petitioners contend that these amounts were not reported on their 2001 return because the forms reporting receipt of these amounts were lost. Petitioners were aware of the accounts and their right to that income. Petitioners had a duty to review their return for accuracy and could have easily discovered that this income was not reported. Their failure to report that income is due to negligence. Petitioners' reliance on their return preparer does not excuse their failure to report income that they should have been aware of. Petitioners also suggest that these amounts may have been reported on QES's 2001 return by mistake. However, we cannot determine from the record that these amounts were reported on QES's 2001 return. We find that petitioners are liable for

---

[10]Respondent contends, without proof, that petitioners may have been involved in an abusive trust scheme. The evidence does not support this allegation.

the section 6662(a) penalty for negligence with respect to the underpayments resulting from the failure to report the interest and royalty income for 2001.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.